UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No. 9:25-cv-81513

**CHECKERPROP FLORIDA 5360 NW 35TH, LLC**,

    *Plaintiff*,

v.

**ERGUN TARKAN CAKIR**,

    *Defendant*.

## COMPLAINT

Plaintiff, CHECKERPROP FLORIDA 5360 NW 35TH, LLC ("Plaintiff" or "Checkerprop"), sues Defendant, ERGUN TARKAN CAKIR ("Defendant" or "Cakir"), and states as follows:

## INTRODUCTION

1. This lawsuit arises from Cakir's false representations to Checkerprop, the owner of a warehouse, to induce Checkerprop into leasing the warehouse to Cakir's company, Bedding US, Inc. ("Bedding US").

2. When Checkerprop required Bedding US, Inc. ("Bedding US") to obtain a guarantor before entering into the lease agreement, Cakir repeatedly represented to Checkerprop that an unaffiliated business, Hudson Global Marketing USA ("Hudson"), would serve as the guarantor.

3. In truth, Hudson never agreed to serve as the guarantor and did not know about Cakir's representations to Checkerprop. Cakir also enlisted a friend, Tufan Tabak, to sign the

- 1 -

guaranty agreement on behalf of Hudson. Hudson never authorized Tabak to bind Hudson to the guaranty agreement.

4. As a result of this fraud, Checkerprop entered into the commercial lease with Bedding US. Checkerprop discovered the fraud once Bedding US breached the lease agreement by failing to pay the required rent and Checkerprop attempted to enforce the guaranty agreement against Hudson. As a result of the fraud, Checkerprop sustained substantial losses, such as unpaid rent. Checkerprop brings this lawsuit to recover those damages.

## PARTIES

5. Checkerprop is a limited liability company organized under the laws of Delaware. Checkerprop's sole member is Checkerprop Holdings, LLC, a limited liability company organized under the laws of Nevada. Checkerprop Holdings, LLC has two members, a trust formed under the State of Nevada (the "Nevada Trust"), and a trust formed under the State of California (the "California Trust").

6. The Nevada Trust is a traditional trust because, under the law of the State of Nevada, the trust lacks traditional juridical person status and, therefore, is incapable of being haled into court except through the trustees of the trust. The trustees for the Nevada Trust are Terence P. Scheckter, a citizen of the State of California, and Premier Trust, Inc., a Nevada chartered trust company with a principal place of business located in Nevada.

7. The California Trust is a traditional trust because, under the law of the State of California, the trust lacks traditional juridical person status and, therefore, is incapable of being haled into court except through the trustee of the trust. The trustee for the California Trust is Terence P. Scheckter, a citizen of the State of California.

8. Accordingly, for purposes of diversity jurisdiction, Checkerprop Florida 5360 NW 35th, LLC is considered a citizen of the State of California and the State of Nevada.

9. Cakir is an individual residing in Palm Beach County and a citizen of the State of Florida.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because: (a) the amount in controversy exceeds $75,000.00, exclusive of interest and costs; and (b) there is diversity of citizenship between the parties because Checkerprop is considered a citizen of the State of California and the State of Nevada, and Cakir is a citizen of the State of Florida.

11. This Court has personal jurisdiction over Cakir because he resides in the State of Florida and is engaged in substantial and not isolated activity within Florida. *See* § 48.193(2), Fla. Stat.

12. This Court also has personal jurisdiction over Cakir because Checkerprop's claims allege tortious acts occurring in Florida. *See* § 48.193(1)(a)(2), Fla. Stat.

13. The Court's exercise of personal jurisdiction over the Cakir does not offend traditional notions of fair play and substantial justice and is consistent with the Fourteenth Amendment's Due Process Clause.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because Cakir is a resident of Palm Beach County, Florida.

15. All conditions precedent to Checkerprop's initiation of this action have been waived or performed.

## GENERAL ALLEGATIONS

**A) Checkerprop enters into a commercial lease agreement with Bedding US, relying on Cakir's representations that Hudson would serve as a guarantor.**

16. Checkerprop is the owner and lessor of certain improved real property located at Suite A, 5360 NW 35th Avenue, Fort Lauderdale, Florida 33309 (the "Property").

17. Bedding US is a Florida for-profit corporation and maintained a principal address at 5360 NW 35th Avenue, Fort Lauderdale, FL.

18. According to the Florida Division of Corporations, Cakir is the Chairman of Bedding US.

19. In or around November 2021, Checkerprop and Bedding US began negotiating a commercial lease for the Property. Cakir retained the services of Elif Pearl, a licensed real estate agent, to assist him in these negotiations with Checkerprop.

20. Throughout the negotiations, Cakir or Pearl communicated with Checkerprop and its real estate broker.

21. As a condition for entering into the lease agreement, Checkerprop required a guarantor to execute a guaranty agreement, whereby the guarantor would agree to keep and perform all obligations in the written lease agreement required of Bedding US if Bedding US failed to abide by its contractual obligations.

22. During the negotiations, Cakir represented to Pearl that Hudson would serve as the guarantor for the lease. With Cakir's authorization, Pearl made this representation to Checkerprop's broker.

23. Relying on the representation from Cakir, Checkerprop agreed to the terms of a revised proposal to lease the Property to Bedding US dated December 8, 2021 (the "Proposal").

The Proposal included a requirement that Hudson would serve as the guarantor for the lease agreement.

24. On December 8, 2021, Cakir executed the Proposal on behalf of Bedding US.

25. Pearl then emailed the Proposal to Checkerprop's real estate broker on December 8, 2021. In the email, Pearl reiterated to Checkerprop that Hudson would serve as the guarantor, writing:

> Please find the signed proposal attached. The CEO of Hudson Global and Erciyes Holding is the same person. Hudson Global is %100[sic] owned by Erciyes Holding., and the reason the guarantor to be Hudson Global is that it is the U.S based company which represents Erciyes Holding.[1]

26. Cakir was the source of the information contained in Pearl's December 8, 2021, email regarding Hudson, its relationship to Erciyes Holding, and its agreement to serve as a guarantor. Cakir knew and intended for Pearl to provide this information to Checkerprop to induce Checkerprop to enter into the commercial lease agreement with Bedding US.

27. On December 23, 2021, Checkerprop, through its real estate broker, sent the written lease agreement for the Property (the "Lease Agreement") to Pearl. Checkerprop's real estate broker also wrote in an email to Pearl that "Hudson is required to sign as the Guarantor (on the Guarantee [sic] exhibit) and have the Guarantee notarized."

28. On December 27, 2021, Checkerprop's real estate broker wrote to Pearl asking her about the status of the fully executed Lease Agreement, which included the Guaranty Agreement. Later that day, Pearl wrote back, stating: "The CEO of the guarantor is in Turkey, so that the notary will take a day or 2. I would like to go over with you about Bedding US questions for the payments.

---

[1] Erciyes Anadolu Holding, also known as Erciyes Holding, is a Turkish corporation that operates in multiple industries.

[W]hen is it a good time?" This information regarding the delay in Hudson signing the Guaranty Agreement originated from Cakir.

29. On December 29, 2021, Cakir emailed the signed Lease Agreement to Pearl, a Checkerprop representative, and Checkerprop's real estate broker. A true and correct copy of the Lease Agreement is attached hereto as **Exhibit 1** and incorporated by reference herein. Cakir executed the Lease Agreement on behalf of Bedding US.

30. Checkerprop reasonably relied on Cakir's representation that Hudson agreed to serve as the guarantor and executed the Guaranty Agreement when it entered into the Lease Agreement with Bedding US. If Checkerprop knew that Hudson had not, in fact, agreed to the Guaranty Agreement, Checkerprop would not have entered into the Lease Agreement.

**B) Bedding US breaches the Lease Agreement**

31. Pursuant to the Lease Agreement, Bedding US (referred to in the Lease Agreement as "Tenant") was obligated to pay Checkerprop (referred to in the Lease Agreement as "Landlord") Monthly Base Rent and Additional Rent, among other amounts (collectively "Rent"), commencing on January 1, 2022, and on the first day of each calendar month thereafter during the term of the Lease Agreement.

32. The Lease Agreement also contained a Guaranty Agreement. **Ex. 1** at Ex. C (the "Guaranty Agreement"). Based on Cakir's representation, Checkerprop expected that an authorized representative of Hudson would execute the Guaranty Agreement on behalf of Hudson.

33. The Guaranty Agreement identified the guarantor to the agreement as Hudson Global Marketing USA. The Guaranty Agreement contained a signature line for "Alpaslan Baki Ertekin" on behalf of Hudson. The signature line for Ertekin indicated that Ertekin's signature

was signed by another person on behalf of Ertekin.[2] The Guaranty Agreement also contained a signature by a person named Tufan Tabak.

34. The Guaranty Agreement stated that the guarantor, Hudson, agreed that if Bedding US defaulted in the performance of its obligations under the Lease Agreement, that Hudson would keep, perform, and observe those obligations in the place and stead of Bedding US. *Id.* at Ex. C, ¶ 7.

35. The failure to pay monthly Rent within ten days of the date in which the Rent became due constituted a default and breach of the Lease Agreement. **Ex. 1** at ¶ 17.01, Section III.

36. The Lease Agreement also provided that, in the event of a default by Bedding US, Checkerprop "shall have the right to immediately terminate Tenant's right to possession of the Premises and/or this Lease and all rights of Tenant hereunder, including but not limited to all options to renew and purchased, by delivering written notice of termination to Tenant." *Id.* at ¶ 17.02(a), Section III. If Checkerprop elected to terminate Bedding US' possession and/or the Lease Agreement, Checkerprop was entitled to accelerate all future rents payable under the Lease Agreement to be immediately due and payable. *Id.*

37. Beginning in the month of February 2023 and continuing through August 22, 2024, Bedding US failed to pay monthly Rent as required under the terms of the Lease Agreement.

38. Checkerprop, through its legal counsel, delivered to Bedding US a Notice of Default (the "Default Notice") for failure to pay Rent for the months of February 2023 through August 2024, among other amounts, and demanded that Bedding US tender full payment of the

---

[2] The signature line erroneously refers to Hudson as Hudson Global Marketing LLC.

Rent (other than attorney's fees and penalties) then due under the Lease Agreement and/or return the Property to Checkerprop.

39. Despite receiving the Default Notice, Bedding US failed and/or refused to pay the monthly Rent and the accelerated Rent due to Checkerprop pursuant to the Lease Agreement and Default Notice.

40. Bedding US is now in default of its obligations under the terms of the Lease Agreement by failing to timely pay Checkerprop the full amount of Rent due and owing pursuant to the Lease Agreement.

41. On August 30, 2024, Checkerprop filed a Complaint in the Seventeenth Judicial Circuit, in and for Broward County, Florida (Case No. CACE-24-012508) against Bedding US and Hudson, alleging claims for eviction, breach of the Lease Agreement, and breach of the Guaranty Agreement (the "State Court Lawsuit").

42. On December 5, 2024, the Honorable Martin Bidwill, Circuit Judge for the Seventeenth Judicial Circuit, entered a default final judgment for eviction against Bedding US in the State Court Lawsuit.

43. As a result of Bedding US' default of its obligations under the Lease Agreement, Checkerprop has suffered and continues to suffer damages. Specifically, Bedding US has not fully paid all Rent owing under the Lease Agreement.[3]

**C) During the Lawsuit, Checkerprop discovers Cakir's fraud.**

44. On February 14, 2025, Hudson filed its answer to the State Court Lawsuit. Hudson asserted that Tufan Tabak was never an agent of Hudson or Ertekin and, therefore, lacked the

---

[3] Bedding US has made partial Rent payments to Checkerprop since the filing of the State Court Lawsuit, but a substantial amount remains due and owing.

authority to execute the Guaranty Agreement on behalf of Hudson. Hudson also asserted that the purported signature of Alpaslan Baki Ertekin, on behalf of Hudson, was a forgery.

45. In connection with the State Court Lawsuit, Checkerprop's counsel deposed Tufan Tabak on May 24, 2025. During the deposition, Tabak testified that he was a friend and business associate of Cakir. Tabak also testified that, in or around December 2021, Cakir requested that Tabak sign the Guaranty Agreement on behalf of Ertekin and Hudson.

46. Tabak further testified that Cakir provided him with a letter purportedly signed by "Alparslan Baki Ertekin" on behalf of Hudson (the "Letter"). The Letter was dated December 7, 2021, and claimed that Ertekin was authorizing Tabak to execute the Lease Agreement on behalf of Ertekin, the Chief Executive Officer of Hudson. Tabak admitted that he never provided services to Hudson or served as a representative of Hudson in the past.

47. Checkerprop's counsel also deposed Yesim Avunduk, a director of Hudson, on October 24, 205. Avunduk testified that, prior to learning of the State Court Lawsuit, neither Hudson nor its parent company, Erciyes Holding, had ever received a copy of the Guaranty Agreement. Avunduk stated that Hudson and Erciyes Holding maintains copies of all contracts and all other legal documents that it signs.

48. Avunduk testified that Tabak has never been an employee, agent, director, or officer of Hudson and, therefore, he lacked the authority to execute the Guaranty Agreement on behalf of Hudson.

49. Avunduk further testified that she reviewed the Letter that Cakir provided Tabak. Avunduk stated that the letter misspelled Ertekin's first name as "Alparslan" instead of "Alpaslan." Avunduk explained that these are two distinct names in Turkish, that Ertekin is very

specific that his first name should never be misspelled as "Alparslan," and that Ertekin would not sign a letter that misspelled his first name.

50. Avunduk also testified that she has spoken with Ertekin, and he informed her that he did not sign the Guaranty Agreement and never authorized Cakir or Tabak to sign the Guaranty Agreement on his behalf (or on behalf of Hudson).

51. The Letter purportedly signed by Ertekin, authorizing Tabak to sign the Guaranty Agreement, is also dated December 7, 2021, which is before Checkerprop ever sent the Proposal or Lease Agreement to Cakir, further demonstrating that the Letter is a forgery.

52. Bedding US failed to pay all Rent due and owing to Checkerprop and that amount exceeds $75,000, exclusive of attorneys' fees, costs, interest, and penalties. Because of Cakir's fraud, Checkerprop has been unable to recover the outstanding Rent from a guarantor, an amount that exceeds $75,000, exclusive of attorneys' fees, costs, interest, and penalties.

## Count One – Fraud

53. Plaintiff re-alleges and incorporates Paragraphs 1 through 52 as if fully set forth herein.

54. Cakir made a false statement concerning a material fact to Checkerprop. Specifically, the false statements were that: (1) Hudson agreed to serve as the guarantor for the Lease Agreement; and (2) Hudson executed the Guaranty Agreement. These statements were false because Hudson never agreed to serve as the guarantor to the Lease Agreement and never executed the Guaranty Agreement. These statements concerned a material fact because Checkerprop required a guarantor who would execute the Guaranty Agreement as a condition to entering into the Lease Agreement.

55. Cakir knew that these representations were false, or should have known of the falsity of the statements, because: (1) he knew that Hudson had never agreed to serve as the guarantor; (2)

he never requested Hudson to serve as the guarantor or to execute the Guaranty Agreement; (3) he created the forged Letter to indicate that Ertekin authorized Tabak to sign the Guaranty Agreement; and (4) he knew that Ertekin or Hudson never authorized Tabak to sign the Guaranty Agreement on their behalf.

56. Cakir made the false representations with the intention to induce Checkerprop's reliance. Cakir knew that Checkerprop required a guarantor to execute the Guaranty Agreement before it would enter into the Lease Agreement. Cakir also knew that by making false representations about Hudson agreeing to serve as the guarantor and if he presented Checkerprop with an executed Guaranty Agreement, then Checkerprop would enter into the Lease Agreement with Bedding US.

57. As a result of these false representations, Checkerprop justifiably relied on the false statements to its detriment in that it entered in the Lease Agreement with Bedding US. As a direct and proximate cause of Checkerprop's justified reliance on Cakir's representations, Checkerprop was injured because Bedding US failed to comply with its lease obligations, including the failure to pay Rent, which remains due and owing to Checkerprop. Furthermore, as a direct and proximate cause of Checkerprop's justified reliance on Cakir's representations, Checkerprop was injured because it was unable to pursue the outstanding Rent from a guarantor.

## Count Two – Fraudulent Misrepresentation

58. Plaintiff re-alleges and incorporates Paragraphs 1 through 52 as if fully set forth herein.

59. Cakir made a false statement concerning a material fact to Checkerprop. Specifically, the false statements were that: (1) Hudson agreed to serve as the guarantor for the Lease Agreement; and (2) Hudson executed the Guaranty Agreement. These statements were false

because Hudson never agreed to serve as the guarantor to the Lease Agreement and never executed the Guaranty Agreement. These statements concerned a material fact because Checkerprop required a guarantor who would execute the Guaranty Agreement as a condition to entering into the Lease Agreement.

60. Cakir's knowledge at the time the misrepresentations were made the statements false because: (1) he knew that Hudson had never agreed to serve as the guarantor; (2) he never requested Hudson to serve as the guarantor or to execute the Guaranty Agreement; (3) he created the forged Letter to indicate that Ertekin authorized Tabak to sign the Guaranty Agreement; and (4) he knew that Ertekin or Hudson never authorized Tabak to sign the Guaranty Agreement on their behalf.

61. Cakir made the false representations with the intention to induce Checkerprop to act in reliance on the statements. Specifically, Cakir knew that Checkerprop required a guarantor to execute the Guaranty Agreement before it would enter into the Lease Agreement. Cakir also knew that by making false representations about Hudson agreeing to serve as the guarantor and if he presented Checkerprop with an executed Guaranty Agreement, then Checkerprop would enter into the Lease Agreement with Bedding US.

62. As a result of these false representations, Checkerprop justifiably relied on the false statements and suffered damages or injuries in that it entered in the Lease Agreement with Bedding US. As a direct and proximate cause of Checkerprop's justified reliance on Cakir's representations, Checkerprop was damaged or injured because Bedding US failed to comply with its lease obligations, including the failure to pay Rent, which remains due and owing to Checkerprop. Furthermore, as a direct and proximate cause of Checkerprop's justified reliance on Cakir's

representations, Checkerprop was damaged or injured because it was unable to pursue the outstanding Rent from a guarantor.

### Count Three – Negligent Misrepresentation

63. Plaintiff re-alleges and incorporates Paragraphs 1 through 52 as if fully set forth herein.

64. Cakir made a misrepresentation concerning a material fact to Checkerprop. Specifically, the false statements were that: (1) Hudson agreed to serve as the guarantor for the Lease Agreement; and (2) Hudson executed the Guaranty Agreement. These statements were false because Hudson never agreed to serve as the guarantor to the Lease Agreement and never executed the Guaranty Agreement. These statements concerned a material fact because Checkerprop required a guarantor who would execute the Guaranty Agreement as a condition to entering into the Lease Agreement.

65. Cakir either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false because: (1) he knew or should have known that Hudson had never agreed to serve as the guarantor; (2) he never requested Hudson to serve as the guarantor or to execute the Guaranty Agreement; (3) he created the forged Letter to indicate that Ertekin authorized Tabak to sign the Guaranty Agreement; and (4) he knew that Ertekin or Hudson never authorized Tabak to sign the Guaranty Agreement on their behalf.

66. Cakir made the misrepresentations with the intention to induce Checkerprop to act in reliance on the statements. Specifically, Cakir knew that Checkerprop required a guarantor to execute the Guaranty Agreement before it would enter into the Lease Agreement. Cakir also knew that by making false representations about Hudson agreeing to serve as the guarantor and if he

presented Checkerprop with an executed Guaranty Agreement, then Checkerprop would enter into the Lease Agreement with Bedding US.

67. As a result of these false representations, Checkerprop justifiably relied on the false statements and suffered damages or injuries in that it entered in the Lease Agreement with Bedding US. As a direct and proximate cause of Checkerprop's justified reliance on Cakir's representations, Checkerprop was damaged or injured because Bedding US failed to comply with its lease obligations, including the failure to pay Rent, which remains due and owing to Checkerprop. Furthermore, as a direct and proximate cause of Checkerprop's justified reliance on Cakir's representations, Checkerprop was damaged or injured because it was unable to pursue the outstanding Rent from a guarantor.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Checkerprop demands the following relief from Cakir:

- Compensatory damages;
- Punitive damages;
- Pre- and post-judgment interest;
- Attorneys' fees and costs; and
- Such other relief as the Court deems just and proper.

| | |
|---|---|
| Dated: December 3, 2025 | Respectfully submitted, |
| | **STUMPHAUZER KOLAYA NADLER & SLOMAN, PLLC** |
| | 2 South Biscayne Boulevard, Suite 1600 |
| | Miami, Florida 33131 |
| | Tel.: (305) 614-1400 |
| | Fax: (305) 614-1425 |
| | |
| | By: */s/ Timothy A. Kolaya* |
| | Timothy A. Kolaya (FBN: 056140) |
| | tkolaya@sknlaw.com |
| | Matthew DellaBetta (FBN: 1031216) |
| | mdellabetta@sknlaw.com |
| | |
| | *Attorneys for Checkerprop Florida 5360 NW 35th, LLC* |